**SO ORDERED.**

**SIGNED this 14th day of May, 2015.**





Robert E. Nugent
United States Chief Bankruptcy Judge

_____

DESIGNATED FOR ONLINE PUBLICATION

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ROBERT DALE GAINES and | ) | Case No. 14-11766 |
| TINA LEA WATSON, | ) | Chapter 13 |
| | ) | |
| Debtors. | ) | |
| | ) | |

## MEMORANDUM OPINION

Kansas recognizes common law marriages. If each member of a couple has capacity to marry, intends to be married, and holds themselves out as husband and wife, common law deems them wed. Married couples may file joint bankruptcy cases. But if the couple's marital status is challenged, it is their burden to prove that they are married as a matter of law and therefore entitled to relief. Kansas homestead law preserves the exempt character of a debtor's homestead unless a creditor can demonstrate by "positive and clear evidence" that the debtor has abandoned the home

1

without intention to return. This case presents an interesting intersection of those two state law principles.[1]

After Robert Gaines and his former wife were divorced, he became romantically involved with Tina Watson, living with her in Salina, Kansas. When she became ill, he and she declared to Robert's employer that they were domestic partners and he enrolled her in his employer's health insurance plan. Each testified to their devotion to one another, that they consider themselves married, and that they hold themselves out as married. When they began to live together, both had been divorced. If they demonstrated that they met the three standards for common law marriage on the date they filed this case, they are eligible to be joint debtors. Robert owns the home that Tina periodically inhabited in Oberlin (first from 2008-2010 and again later from July 2013 to and including the date of the bankruptcy petition), but both debtors relocated to Salina for work in 2010 where they lived together part of the time during which they claimed they were married. They claim the Oberlin house as their homestead, stating that they intend to return to Oberlin to live. Whether they're married or not, if each debtor has demonstrated the requisite intent to return to and inhabit the house in Oberlin as their homestead, the Oberlin house retains its exempt nature.

*Facts*

---

[1] The chapter 13 trustee Laurie B. Williams appears by her attorney Karin N. Amyx. The debtors appear by their attorney Rick Hodge.

2

Sometime in the late 1990s, Robert and Tina met while they were working for the school district in Brighton, Colorado and formed a friendship. Each was married to someone else then, but they were both having marital issues. Robert had lived in Oberlin, Kansas as a child and relocated there from Colorado in 2000 when he purchased a home on Beaver Street. He worked out of his garage as a mechanic and lived there with his wife, Celeste, until they left Oberlin sometime around 2008. Robert eventually took a job at Phillips Lighting in Salina, about 200 miles east of Oberlin. Though it isn't clear when, it appears that he and Celeste relocated to Salina in 2010, renting a home on Seitz Avenue. He and Celeste separated in 2010 and were divorced by the Saline County District Court in 2011.

Meanwhile, Tina had moved with her mother and daughter to Oberlin sometime in 2008. Now divorced, Tina moved her family into the Beaver Street property, apparently with Robert's permission.[2] He stated that she was in trouble and he was helping to extricate her from "a bad situation." She lived there until 2010 when her job at the Oberlin Chamber of Commerce was eliminated. Robert encouraged her to come to Salina where he found her a place to live and a job at Casey's General Store. According to the Statement of Financial Affairs (SOFA), Question 15, she lived at 330½ South 8th in Salina beginning in July of 2010.[3] Robert testified that after he got divorced, he moved in with her. The SOFA suggests that

---

[2] When Tina moved from Colorado to Kansas she obtained a Kansas driver's license. Issued on November 4, 2008, it expired on September 11, 2014 but Tina has not renewed it. It bears the Beaver Street, Oberlin address. *See* Ex. 3.
[3] When Tina moved to Salina, Robert rented the Oberlin property out to tenants between July 2010 and July 2013.

3

they also occupied a property on Briarwood in Salina (August 2011 to June 2013) before they leased the current Hartford address property in Salina, where Robert lived at the time this case was filed.

Robert owns the Oberlin house outright; Tina and he have possessions in both places. Tina moved back to Oberlin sometime in 2013 after the tenants vacated the Beaver Street property. For some indefinite period after that, Robert would travel to Oberlin on weekends to see Tina or vice versa. Robert described Tina's move back to Oberlin as a "cost-cutting" measure. Since July 2013, Tina has lived at various times in both Oberlin and Salina. They occupied a series of residences, though it is somewhat unclear in what order or how long they resided at each. It does appear that they lived together at various times but, on July 31, 2014, the date of the petition, they were living apart.[4] Both debtors testified that they intend to return to Oberlin to live full time because the Salina Phillips Lighting plant is for sale and may well close. To this end, they purportedly mailed an undated letter to their landlord a week before the trial of this matter to advise the landlord of their intent to terminate the tenancy on Hartford and move out by the end of April 2015.[5] Robert testified that he intends to live permanently in the Beaver house – as his retirement home. Tina is not currently working but may return to Casey's General Store to complete training for a management position to enable her to transfer to a store near Oberlin.

---

[4] The petition shows Robert having a current address at the Hartford property in Salina while Tina has a current address at the Beaver property in Oberlin. Schedule J, line 24 indicates they are currently living apart.

[5] Ex. 4. This undated document introduced into evidence is the only one where Tina used the "Gaines" surname.

Tina became ill at some point in their relationship and required hospitalization. She has a chronic illness that apparently manifested itself in February of 2014. There are no physician specialists in Oberlin so she seeks periodic medical care in Salina. When Tina became acutely ill in February of 2014, Robert and she decided it was time for them to "quit playing house" as he put it. According to Robert, Tina's health event was the definitive moment when he and Tina became husband and wife. He then took measures to place her on Phillips Lighting's employee health plan as his dependent. He enrolled Tina shortly thereafter, claiming her as his "domestic partner." As part of the paperwork, both Tina and Robert executed a "Phillips Health Plans Document of Domestic Partnership" or DDP.[6] The DDP states the signers "certify" that they are eligible for coverage as "domestic partners" under the company's health plan and that they are, among other things, at least 18, not related by blood or adoptions, live together in a committed monogamous relationship, and have been in such a relationship for the prior six months. They also certify that they "*are not married to each other* or legally married to, or in a domestic partnership with, any other person." The DDP that debtors offered in evidence is undated.

Additional documentation accompanying the DDP that appears to have been printed from the company benefits website defines "domestic partner" as someone of the same or opposite sex who is an adult partner of the employee living together for at least six months, mutually dependent and financially responsible for one another's wellbeing, not related to one another and not married to or a domestic partner of a

---

[6] Ex. 8, p. 18.

third party. The domestic partner definition doesn't exclude a person who is married to the employee.[7] At the same time, a spouse qualifies as a dependent and Robert could have enrolled Tina as his spouse if they were in a common law marriage at that time.[8]

It is unclear if Robert was able to add Tina to his employer's health coverage when they executed the DDP document mid-year. The same website screenshot suggests that he was outside the enrollment window to add Tina as a dependent to his employer's health plan in 2014.[9] Both of Robert's 2014 and 2015 Enrollment Summaries that show Tina as his dependent for health coverage were "selected" *as of December 2, 2014,* suggesting that Tina was not actually enrolled as a dependent domestic partner under Robert's health plan until late 2014 or more likely, 2015.[10] Finally, Robert also named Tina as his beneficiary under a life insurance policy obtained through his employment.[11]

Robert and Tina filed separate Form 1040 tax returns for 2012, 2013, and 2014. Each filed as a "single" taxpayer. They amended their respective 2014 returns to file as "married filing separately," signing those amended returns on March 11, 2015, a week before the trial of this matter.[12] They testified that they amended their 2014

---

[7] *Id.* at p. 22.
[8] A domestic partner is clearly a separate and distinct dependent category from a married person under the health plan. Both relationships qualify as eligible dependents of the employee under Robert's health plan. *See* Ex. 8, p.21.
[9] *Id.* The screen also cautions that "[a]dding a dependent here does NOT automatically enroll him/her in any benefits."
[10] *Id.* at pp. 19-20.
[11] *Id.* at p. 23.
[12] Ex. 6 and 7.

6

returns because their accountant told them that filing as single persons could be construed as tax fraud. Their explanation provided on the amended returns states that they are common law husband and wife and that their attorney advised them they "had to file married filing separate."[13]

In his testimony, Robert insisted that he often referred to Tina as his wife in conversations with third parties. She agreed that he acted like a husband, bringing her lunch to work, for instance, and that they had acted as husband and wife as early as 2012 when Robert proposed to her while they were on a motorcycle ride. There was no evidence that they obtained or wore wedding rings. According to Robert, Tina was a signatory on his bank account but not an account owner due to her prior history of unpaid debts. Their bankruptcy intake questionnaire dated June 10, 2014 shows Tina as Robert's spouse and both living at the Hartford address in Salina.[14]

Robert and Tina filed their joint chapter 13 petition on July 31, 2014. Robert listed his address as the Hartford Street, Salina address while Tina, as joint debtor, listed her address as the 302 N. Beaver, Oberlin address.[15] On Schedule J, line 24, debtors state that they "live apart right now," but anticipate Robert moving to Oberlin if he loses his employment with Phillips in Salina. They claimed this Beaver property as their exempt homestead. In their first amended chapter 13 plan they propose to

---

[13] Ex. 6 and 7, Part III of Form 1040X. Both amended returns listed the Hartford address in Salina as their current home address.
[14] Ex. 1.
[15] The Court notes that on December 2, 2014, Tina filed a change of address from "302 N. Beaver, Oberlin, KS 67749" to "306 N. Beaver Ave., Oberlin, KS 67749." *See* Dkt. 28. On the notice, Tina used the surname of Gaines. This change of address was not mentioned at trial.

7

pay $250 per month over an applicable commitment period of 60 months but seek to deviate from the disposable income calculation on Form 22C under *In re Lanning*, due to Tina's unemployment, and propose no distribution to unsecured creditors.[16] The chapter 13 trustee objects to the claimed homestead exemption on the basis that Robert does not occupy the Oberlin property as his principal residence.[17] She also objects to confirmation of the plan and filed a motion for dismissal under 11 U.S.C. § 302 on the basis that debtors are not married and ineligible to file a joint case.[18] At trial, the evidence focused on the debtors' eligibility to be joint debtors and their homestead exemption. In post-trial briefing, debtors submitted a certified copy of Robert's divorce decree from Celeste entered by the Saline County District Court on February 2, 2011 to support his trial testimony.[19] The trustee objects to admission of this document as part of the evidentiary record and asks that it be stricken and not considered by the Court.[20] The Court will address the propriety of considering the divorce decree when it addresses the common law marriage issue below.

*Analysis*

**Is the 302 N. Beaver, Oberlin residence the debtors' homestead?**

---

[16] Dkt. 36.
[17] Dkt. 16.
[18] Dkt. 22 and 38.
[19] Dkt. 50. In closing argument, the chapter 13 trustee questioned Robert's capacity to marry Tina because she challenged Robert's proof that he had obtained a divorce from Celeste as he testified. The trustee had offered no proof into evidence that Robert remained married to Celeste but suggested that she was unable to find any record of their divorce decree. Robert's divorce from Celeste was essential to demonstrate that he had the capacity to marry Tina.
[20] Dkt. 51.

8

The Trustee objects to the debtors' homestead exemption.[21] She argues that Robert's and Tina's repeated absence amounts to an abandonment of the homestead. Kansas residents may claim their home as a homestead if they meet the following criteria set out in the Kansas Constitution and statutes. KAN. STAT. ANN. § 60-2301 implements the homestead exemption afforded all Kansans in the Kansas Constitution at Article 15, § 9. Section 9 provides that—

> A homestead to the extent of one hundred and sixty acres of farming land, or of one acre within the limits of an incorporated town or city, occupied as a residence by the family of the owner, together with all the improvements on the same, shall be exempted from forced sale under any process of law, and shall not be alienated without the joint consent of husband and wife, when that relation exists; . . .[22]

The statutory exemption § 60-2301 contains the same provisions almost verbatim.[23] 11 U.S.C. § 522(b)(2) authorizes a debtor to elect to claim property exempt for his bankruptcy estate if it is exempt at state law and if such an election is permitted under state law. Kansas law directs that, with certain exceptions not relevant here, debtors may only claim state law exemptions.[24] Parties in bankruptcy cases who file timely objections to exemptions bear the burden of proving the exemption is not properly claimed.[25] Here, the trustee's principle objection is that

---

[21] Dkt. 16.
[22] KAN. CONST. Art. 15, § 9.
[23] KAN. STAT. ANN. § 60-2301 (2014 Supp.). In addition to the language in the state constitution, the statutory provision makes clear that a homestead exemption may be claimed in a manufactured home or mobile home occupied as a residence. It also clarifies that when property outside a city is claimed exempt, the homestead rights are not lost when the property is subsequently annexed by the city. *See* KAN. STAT. ANN. § 12-524a (2014 Supp.).
[24] KAN. STAT. ANN. § 60-2312(a) (2005).
[25] Fed. R. Bankr. P. 4003(c); *In re Letterman,* 356 B.R. 540, 542 (Bankr. D. Kan. 2006).

Robert is absent from Oberlin and maintains a residence in Salina. Robert credibly testified that he has retained the house, which is unencumbered, as a retirement home. He also testified that his employer was about to sell its plant in Salina and that he would move back to Oberlin and live in the home there. He acted upon this intent by giving notice to his landlord of his intent to terminate his Salina tenancy at the end of April, 2015, and move back to "our home in Oberlin." He allowed Tina to live there as his wife or domestic partner since July of 2013 and they had belongings and furnishings in the Oberlin home. The trustee did not effectively controvert any of this testimony.

A long line of Kansas cases holds that when an absent homesteader shows an intention to return, the uninhabited homestead retains its exempt character. In *Bellport v. Harder*, the Kansas Supreme Court said that "[W]hile occupancy as a residence is essential to the establishment of a homestead, once a residence has been established, such residence is presumed to continue until the contrary is clearly shown."[26] Even a debtor's acquiring property and residing in another state does not terminate the homestead in the absence of "positive and clear" evidence.[27] Nor does the fact that Robert rented the Oberlin home to tenants for a few years during his absence establish an abandonment of the homestead.[28] The trustee didn't show that Robert had taken any steps, other than being absent for an extended period of time, to terminate his homestead interest. She certainly did not prove by positive and clear

---

[26] *Bellport v. Harder*, 196 Kan. 294, 298, 411 P.2d 725 (1966).
[27] *Elliott v. Parlin & Orendorff Co.*, 71 Kan. 665, 81 Pac. 500, 501 (1905).
[28] *Bellport, supra* at 298.

10

evidence that he has abandoned the Oberlin property; nor did she meet the presumption that a homestead continues once it has been established. To the contrary, while working his job in Salina, Robert comes and goes from there frequently and allows Tina to live there, too. They have personal belongings at the Oberlin home. He and she pay utilities and otherwise maintains the property. At a minimum, Robert has clearly demonstrated his intent to return to the Oberlin property upon ending his employment in Salina and retiring to his permanent residence with Tina.[29]

The same rules apply to determining whether Tina's homestead exemption claim is valid, though she is in a different position because she has inhabited the property since 2013, as either Robert's domestic partner, his common law wife, or simply at Robert's sufferance. She moved from Salina back to Oberlin in the summer of 2013 and has occupied the property since that time, with periodic trips to Salina for medical care or to spend time with Robert. Tina listed the Oberlin property as her current address on the bankruptcy petition. Her lack of a record title interest does not weaken her homestead claim if she occupies the home as a family residence. Indeed, in *Redmond v. Kester*, the Kansas Supreme Court held that the term "owner" in both the Constitution and the statute includes occupants who hold any type of interest, including the equitable interest that a beneficiary of a self-settled living

---

[29] *See Beard v. Montgomery Ward and Co.,* 215 Kan. 343, 348, 524 P.2d 1159 (1974) (Residence means the place adopted by a person as his place of habitation, and to which, whenever he is absent, he has the intention of returning.).

11

trust holds.[30] So even if Tina is not married to Robert and cannot claim a homestead interest as his spouse, her previously-established occupancy of that property as his domestic partner would suffice to render her interest in the home exempt as well.[31] Nothing the trustee has presented overcomes Tina's established occupancy nor her intent to continue to occupy the home with Robert, either as his domestic partner or his common law spouse. Keeping in mind Kansas policy to liberally construe claims of homestead exemption and the trustee's burden of proof on an exemption claim, the trustee's objection to Robert and Tina's homestead exemption must be overruled.[32]

**Were Robert Gaines and Tina Watson married when the bankruptcy case was filed?**

This is a much closer question. Kansas has long recognized common law marriages. In general, if a man and a woman have the capacity to marry, if they presently agree to be married, and if they hold themselves out to the public as being married, state law recognizes them as husband and wife.[33] It is essential that the

---

[30] *Redmond v. Kester*, 284 Kan. 209, 216, 159 P.3d 1004 (2007). *See also In re Estate of Fink*, 4 Kan. App. 2d 523, 532-33, 609 P.2d 211 (1980) (Even though wife left homestead due to husband's drinking, and property was sold after his death to her children, she intended to inhabit the home they intended to build for her. Her homestead interest through her husband continued without regard to her loss of actual record title ownership of the fee.).
[31] *Redmond v. Kester, supra* at 216 (Debtors may claim homestead exemption based on any interest in real estate, whether legal or equitable, as long as they have not abandoned their occupation or intent to occupy the property.). *See also In re Brown*, 408 B.R. 262 (Bankr. D. Minn. 2009) (Debtor who occupied homestead with his domestic partner had equitable interest in property and could claim property exempt even though it was titled in the name of the other partner.).
[32] *Redmond v. Kester, supra* at 212.
[33] *Fleming v. Fleming*, 221 Kan. 290, 291, 559 P.2d 329 (1977).

12

parties have a present mutual intention to be married; evidence of consent to cohabit, without a present marriage agreement between them, is insufficient.[34] The party asserting a common law marriage has the burden of proving it.[35] Only married debtors may file a joint bankruptcy case under 11 U.S.C. § 302. Here, the trustee asserts that Robert Gaines and Tina Watson were not married as a matter of law on the date of the petition, July 31, 2014, and cannot seek joint relief.

Both debtors testified that they were divorced from their prior spouses before moving in together. Nothing in the record sheds doubt on their being free to marry at any time after Robert's divorce in 2011.[36] At trial, each testified that they consider themselves married and described generally how they hold themselves out to the world as being married. But the evidence that was presented requires deeper examination because whether Robert and Tina shared a present intention to be married is less than clear. The Court did not have the benefit of any independent witnesses regarding the debtors' relationship to corroborate the debtors' testimony and is left to determine the credibility of the debtors' testimony and the weight to be given the limited documentary evidence presented to ascertain the debtors' intent. The Court is troubled by the inconsistencies in the debtors' testimony and the lack of

---

[34] *Id.*
[35] *Driscoll v. Driscoll,* 220 Kan. 225, 227, 552 P.2d 629 (1976).
[36] Robert Gaines testified affirmatively that he obtained a divorce from his then-wife Celeste in 2011, but did not offer at trial a copy of his divorce decree. Debtors' counsel appended a certified copy of the Saline County District Court decree to his post-trial brief and the trustee moved to strike it. Because Robert's testimony was not refuted with evidence at trial, there is sufficient evidence in the record without the decree to find that he had the capacity to marry at the time he and Tina began cohabiting.

13

corroborating documents that would have been within the debtors' control to introduce.[37]

Robert and Tina reconnected after several years in 2010, the same year that Robert separated from his then-wife. Tina had been living in Oberlin (in Robert's home) and after she lost her job there, he arranged for her to move to Salina and helped her find a job. He testified that when he lost his home in Salina, after getting divorced, he moved in with her. Thus, sometime in 2011, they began cohabitating. Each testified that they began "seeing" one another romantically in 2012 and that Robert asked Tina if she wanted to get married in 2012 while they were on a motorcycle ride. But neither Robert nor Tina testified that they considered themselves married as early as 2012; in fact, neither of them testified clearly how long they had been in a common law marriage. Robert cited Tina's illness in February 2014 as the defining moment and time to "quit playing house." By contrast, Tina testified that she "sometimes thinks" they might get married. Even if the Court accepts Robert's testimony, their actions belie their words.

---

[37] For example, no lease agreement was offered into evidence showing Robert and Tina as joint tenants of the Hartford property, or any other rented property, in Salina. No bank records or other financial records were introduced to show that they combined their financial affairs. No utility billing statements were presented to show that utilities were set up in both of their names. No car titles were introduced showing joint ownership of vehicles. In fact, the only documents admitted into evidence that suggesting a marital relationship, were the debtors' bankruptcy intake questionnaire, an undated notice of vacating the Hartford tenancy signed by "Bob and Tina Gaines," and an amended 2014 tax return. The latter two documents were generated about a week before trial.

14

While they lived together in Salina, Robert and Tina jointly occupied several leased homes and purchased a storage shed. They received their mail at Salina and sometimes received mail addressed to them both. They began referring to each other as husband and wife to third parties. Tina returned to Robert's home in Oberlin in July of 2013 while Robert remained in Salina and worked. At that point, they both went back and forth between Salina and Oberlin. Robert traveled on weekends to spend time with Tina and Tina would travel to Salina periodically for medical care or to be with Robert. Robert testified that they decided to stop "playing house" and to do whatever was necessary to get Tina on Robert's workplace health plan after she became ill in February of 2014. There is no evidence of when they executed the DDP. When they sought bankruptcy advice from their counsel, they represented themselves as husband and wife on the intake sheet. When they filed this case they listed separate addresses – Tina in Oberlin and Robert in Salina. After they filed this case, they filed their 2014 federal income tax returns as single taxpayers, then amended them in March of 2015 to file as "married filing separately." On their amended returns, they each listed the Hartford address in Salina as their current home address. Their 2012 and 2013 returns were filed as single taxpayers. But shortly before trial of this matter, debtors signed an undated notice of their vacating the Hartford tenancy as "Bob and Tina Gaines." This is the only document in evidence where Tina used Robert's surname.

The question of whether a couple is married at common law arises in many different legal settings and is highly fact-intensive. Several cases illustrate this point.

15

In *Fleming v. Fleming,* the parties divorced in 1969. Mrs. Fleming received an alimony award that terminated upon her death or remarriage. She moved in with another man, prompting Mr. Fleming to move to terminate his alimony obligation by claiming she'd remarried. The state district court held that Mrs. Fleming and her companion were not married as a matter of law. The Supreme Court affirmed, finding that there was no evidence that the companion had undertaken to support Mrs. Fleming or that there was any "present agreement" between them to be married. Her cohabitation did not supply Mr. Fleming grounds to terminate his alimony obligation.[38]

In *Eaton v. Johnston,* the Supreme Court considered the legal relationship of a couple who were divorced in 1977 after a 20 year marriage, but who reestablished a common residence together shortly thereafter, remaining together for another 30 months. They incorporated a business and jointly purchased a home. When they split up again, Ms. Eaton filed an action seeking a declaration that she and Mr. Johnston had not remarried or, in the alternative, for divorce. The state district court concluded that Ms. Eaton had consistently denied the existence of a marriage agreement, that on several occasions Mr. Johnston asked her to remarry him, and that they filed separate tax returns as single taxpayers. Mr. Johnston was also involved with another woman whom he told his family he planned to marry. On these facts, the court concluded that no common law marriage had occurred and that the couple's property could not be divided under KAN. STAT. ANN. § 60-1606 (now KAN. STAT. ANN.

---

[38] 221 Kan. 290, 293.

§ 23-2706) which specifically applied to the division of marital property whether or not a decree of divorce or separate maintenance was granted. The Supreme Court affirmed this finding and held that the trial court had authority independent of § 60-1606 to divide the parties' property.[39]

Another case in which the court found a lack of present marriage agreement is *Schrader v. Schrader*.[40] There, the parties divorced after just six years (and two children), but again began living together, "this time without bothering with anything so trivial as legal formalities."[41] They displayed some public characteristics of being married, but their personal behavior toward each other and to the outside world indicated otherwise. The court found that while the parties filed joint income tax returns and lived together, there was no present understanding that they were married. Mrs. Schrader testified that she didn't formally marry Mr. Schrader again because she wasn't sure enough of their relationship to do so and would have an out if things went badly again. Mr. Schrader corroborated this, stating that they agreed to live together for their children and, if things worked out, they'd remarry. So, while there was evidence of their holding themselves out as married, there was none of a present intention to be married. The Supreme Court affirmed.[42]

These three cases suggest that the existence of a publicly visible and complex joint living arrangement may satisfy the "holding out" factor, but is not enough to

---

[39] *Eaton v. Johnston,* 235 Kan. 323, 328-29, 681 P.2d 606 (1984).
[40] 207 Kan. 349, 484 P.2d 1007 (1971), *disapproved on other grounds by Eaton v. Johnston,* 235 Kan. 323, 681 P. 2d 606 (1984).
[41] 207 Kan. 349, 350.
[42] *Id.* at 351.

17

demonstrate a shared present intention to be married, particularly where the parties have an "out" or their relationship is subject to a future contingency. The cases also state that the parties cannot take actions or legal positions that suggest contrary intent. These parties did.

Two pieces of documentary evidence are particularly damning to debtors' claim of a present marriage agreement necessary to establish a common law marriage. First, Robert and Tina did not file tax returns as married people until they filed their 2014 returns, doing so long after this case was filed and long after the trustee had filed her § 302 motion to dismiss, making it clear to debtors that she was challenging their eligibility to be joint debtors. Even then, the 2014 returns offered in evidence were amended returns that were filed in March of 2015 to reflect that they were changing their filing status from single to "married filing separately," and were amended upon their attorney's advice.[43] Second, when they signed the DDP to obtain health care coverage for Tina as a dependent under Robert's employer's plan, they certified that they were "not married to each other."[44] This all occurred within a few months of their filing this bankruptcy petition and, according to Robert, was the definitive moment when he considered himself married to Tina. The inconsistency here is that, according to the employer's website, a "spouse" qualifies as a dependent of the employee and is eligible for coverage under the employer's health plan.[45] Tina

---

[43] *See* Ex. 6 and 7. No evidence was presented that debtors amended their filing status for tax years 2012 or 2013.
[44] *See* Ex. 8, p. 18.
[45] *Id.* at p. 21.

was not claimed as an eligible dependent as Robert's spouse, but as his domestic partner. Both he and she signed the DDP, suggesting that they did not consider themselves to be married at this time. Nor did they offer any evidence that debtors subsequently formed a present marriage agreement between May of 2014 and the date of filing, July 31, 2014.

These are not the only proof problems, either. Further undercutting their position is the testimony that Robert proposed to Tina in 2012 and that Tina testified she sometime thinks they *will* get married eventually, suggesting that she doesn't think they're married now. They do not consistently cohabitate. In fact, on the petition date, Robert and Tina were living in towns 200 miles apart. Other than their living in leased property together and purchasing a shed, there is no evidence of joint economic activity. Nor is there any evidence that beyond placing her on the Phillips health insurance plan as a domestic partner, Robert has actually undertaken to provide Tina with support, though he clearly does support her. They did not prove how, or even if they have combined their finances, whether they have ever affirmed their commitment to each other in the presence of other witnesses, whether they have exchanged rings, or if they have otherwise manifested the require present intent. Proof that they have lived together prior to filing their bankruptcy and proof that they intend to ultimately live together in Robert's Oberlin home is insufficient to establish a common law marriage. While I am persuaded that Robert and Tina may hold themselves out as married, they failed to carry their burden to prove that they presently intended to be married when the case was filed on July 31, 2014.

Because the debtors were not married on the petition date, this case cannot proceed as a joint case.[46] This leaves the debtors two alternatives. They can seek to deconsolidate and proceed in separate chapter 13 cases. Failing that, I must deny confirmation and dismiss the case because they are ineligible to proceed jointly and therefore have not complied with the provisions of Title 11 and chapter 13, meaning that they cannot demonstrate their compliance with 11 U.S.C. § 1325(a)(1). The debtors shall have 14 days to file a motion to deconsolidate or their case will be dismissed without further notice.

###

---

[46] 11 U.S.C. § 302.